[**Affiant's note:** JEFFERSON states that he keeps a ledger relative to drug derived currency at his address, **4336 Margaret Ridge, Florissant, Missouri**, a target residence of this application.]

40. <u>**Interception #21870:**</u> occurred on July 31, 2006, at approximately 11:11 p.m., ans was captured over target telephone #4, utilized by Sammy JEFFERSON. JEFFERSON is speaking with Eric EARNEST, his narcotic partner, who is at JEFFERSON residence. JEFFERSON directs EARNEST, "Go to the back of the crib (residence) right and back up under the steps right there, as you going in the back door." EARNEST responds, "It's 2750 man." [**Affiant's note:** Your affiant believes that JEFFERSON is directing EARNEST, his narcotic partner, to a hiding spot inside his residence at **4336 Margaret Ridge, Florissant, Missouri**, where EARNEST finds $2,750 secreted. Other wire interceptions during this time frame indicated that the subjects were collecting currency to pay for an upcoming narcotic shipment.]

41. <u>**Related surveillance:**</u> On June 8, 2006, Eric EARNEST was captured in a wire interception over target telephone #1 speaking to a subject identified only as Alex, in Mexico City, Mexico. Alex and EARNEST negotiated a narcotic transaction and Alex directed EARNEST to acquire a T-Mobile brand cellular telephone for further negotiations on the following day.

EARNEST procured the T-Mobile cellular telephone and utilized a Mexican telephone number, provided by Alex on the prior evening, to re-contact Alex on June 9, 2006. This call was verified via subpoenaed air-time summary analysis.

In anticipation of a possible transaction, surveillance was manned at the residences of both EARNEST and JEFFERSON on June 9, 2006, the target addresses of this application. Captured wire interceptions between EARNEST and JEFFERSON over target telephones #1 and #3, revealed that EARNEST was going to meet Alex's underlings/couriers.

JEFFERSON volunteered his residence at **4336 Margaret Ridge** to be utilized as the meet spot, although he would not be present initially. Surveillance did not arrive at this address in time to observe the subjects arrive; however, the wire interceptions indicated the presence of the parties. Eventually, EARNEST advised JEFFERSON, who was still not present at the address, that EARNEST was leaving Alex's underlings/couriers alone at the address, **4336 Margaret Ridge, Florissant, Missouri**, stating to the effect, "so they could do their thing." Following this development, lights in various rooms of the address were observed being turned on and off.

Later in the evening, JEFFERSON was observed arriving at the target address. Agents conducting surveillance observed the multiple-car garage door to the residence open and two subjects

22

(unknown gender/race) standing in the garage next to a dark colored passenger vehicle. The garage door then closed.

Within one half hour, EARNEST arrived back at the residence and left his vehicle running as he went to the front door of the address. JEFFERSON alighted from the residence and met EARNEST outside the front door, where EARNEST handed JEFFERSON a small light colored bag, before again leaving the residence. JEFFERSON returned inside the residence and EARNEST was followed to a service station where he parked and remained inside his vehicle.

Momentarily, a grey colored Porsche Cheyenne pulled on the lot and parked on the opposite end of the lot. The driver of the vehicle occupied by three subjects, alighted from the vehicle and met with EARNEST inside his vehicle. The meeting of several minutes ended with the subject exiting EARNEST's vehicle and returning to his own before leaving the area. The operator of the Porsche was identified as Royce DAVENPORT, a target subject of this investigation. EARNEST returned to his residence located at **3608 Av De Paris, Florissant, Missouri.** [**Affiant's note:** The investigative team believes that EARNEST met with Alex's underlings/couriers at JEFFERSON's residence, a target address of this application, to further, in some part, the narcotic transaction discussed the night before with Alex. It is speculated that the Alex's underlings may have been counting currency to be

used in the transaction that would occur on the following day. See that surveillance below. Clearly, JEFFERSON's address located at **4336 Margaret Ridge, Florissant, Missouri**, played a significant role in the narcotic negotiations on this date. Likewise, EARNEST returned to his target address located at **3608 Av De Paris, Florissant, Missouri**, immediately following his meeting with Royce DAVENPORT, a co-conspirator in the organization under investigation. The investigative team was cognizant that DAVENPORT owed money from an earlier narcotic shipment. Team members speculated that DAVENPORT had made such a narcotic payment towards his narcotic debt to EARNEST on this occasion. Having done so, EARNEST returned to his residence after the meeting.]

42. **Related surveillance:**   On June 10, 2006, surveillance continued with respect to the anticipated narcotic shipment arranged through the Alex subject. Wire interceptions over target telephone #3 indicated that Sammy JEFFERSON was meeting with subjects and possibly distributing narcotics. EARNEST and JEFFERSON had approximately six conversations over target telephones #1 and #3, wherein EARNEST directs JEFFERSON to meet a subject(s), believed to be the Alex underlings/couriers at an unnamed hotel that they had utilized in the past in order to acquire narcotics. Utilizing cellular telephone cell sites associated with JEFFERSON's target telephone #3, JEFFERSON was

tracked to the area of Lindbergh and Watson Rd. in south St. Louis County. There, JEFFERSON was spotted seated in his vehicle on a Holiday Inn hotel parking lot. While attempting to reposition himself in a better vantage point, the team member lost sight of JEFFERSON, who left the area.

Other wire interceptions over target telephone #3, revealed that JEFFERSON was traveling to the Matthews Dickey Boys Club Athletic Field in north St. Louis City. Surveillance then repositioned themselves at this location. Surveillance then observed Royce DAVENPORT arrive at the location in his Porsche Cheyenne and park next to JEFFERSON's vehicle. DAVENPORT alighted from his vehicle and entered JEFFERSON's vehicle. Mere seconds later, DAVENPORT stepped from JEFFERSON's vehicle carrying a plastic bag and returned to his own before leaving the area.

Continuing, wire interceptions over target telephone #3 between JEFFERSON and a subject introduced in this investigation only as B Gotti, revealed that the subjects were going to meet at the same location. Surveillance then observed a silver colored Infinity M45 arrive and park next to JEFFERSON's vehicle. As in the instance above, a black male subject alighted from the vehicle and also got inside of JEFFERSON's vehicle. This subject also alighted from the vehicle within a matter of seconds before returning to his own vehicle and leaving the area.

JEFFERSON was then followed from the Matthews Dickey Boys Club to a barber shop in north St. Louis. During this time frame photographs were able to be taken of JEFFERSON while talking on target telephone #3 to a telephone believed to be utilized by George CLARK, a target subject of this investigation. JEFFERSON advised the subject believed to be CLARK that he was at the barber shop and the subject inquired if JEFFERSON was "riding like that" (had the narcotics with him). JEFFERSON advised that he was and the subject advised that he was arriving in the area.

At about this time, a black colored Lincoln LS parked in front of the barber shop. After JEFFERSON spoke to a female, in what was believed to be an unrelated matter, he walked to the Lincoln and engaged in conversation with the occupant. Momentarily, the parties returned to their respective vehicles and JEFFERSON followed in tandem, the subject in the black Lincoln. The mobile surveillance was short lived as both suspect vehicles began driving at excessive speeds and appeared to be engaging in counter surveillance techniques. [**Affiant's note:** Based on the training and experience of the investigative team, your Affiant is cognizant that the scenario of short term meetings, of a matters of seconds with regard to the DAVENPORT and B Gotti, is indicative of narcotic trafficking. Your Affiant believes that EARNEST and JEFFERSON had taken custody of the narcotic shipment that had earlier been

26

negotiated with Alex, the Mexican source of supply. This scenario, during the same time frame of **Interception #780**, outlined herein, is corroborative that JEFFERSON was directing his paramour to secrete narcotics and/or currency in the barbeque pit in the backyard of his address located at **4336 Margaret Ridge, Florissant, Missouri.**]

V.   **ADDITIONAL FACTORS COMPRISING PROBABLE CAUSE**

43. As demonstrated by the foregoing, which your Affiant knows from the independent statements of the confidential informants, court authorized wire interceptions, surveillance and related investigation, that Eric EARNEST and Sammy JEFFERSON are cell leaders of the narcotic organization under investigation. Moreover, your Affiant believes that the organization under investigation is vast, well funded and that although EARNEST and JEFFERSON do not have any known means of visible support, they reside in the target residences that are clearly outside any legitimate means that are available to the subjects.

44. As part on my experience and training as a Task Force Officer and that of the officers of the investigating team, we have accumulated information and training in the area of extensive, long-term narcotics enterprises involving significant income. I have had experience, as have other members of the investigating team, in debriefing defendants, witnesses, informants and others

having experience in gathering, spending, converting, transporting, distributing and concealing proceeds of narcotics trafficking.

45. Based upon my and investigating team's experience and our participation in other past and pending investigations involving extensive, long-term narcotics enterprises, I know:

    a. That large scale drug traffickers very often place assets in names other than their own to avoid detection of these assets by investigating government agencies;

    b. That even though these assets are in other persons' names, the drug dealers frequently continue to use these assets and exercise control over them;

    c. That large scale narcotics traffickers commonly maintain on hand large amounts of United States currency in order to maintain and finance their ongoing narcotics business and often keep said currency in their residences or a residence under their control;

    d. That large scale drug traffickers often maintain books, records, receipts, notes, ledgers, airline tickets, money orders and other papers relating to the transportation, ordering sale and distribution of controlled substances; that when drug traffickers distribute their narcotics to their clients, that aforementioned documents are frequently maintained in the

traffickers' residences, increasingly in computers, where the drug traffickers have ready access to them;

 e. That it is common for dealers participating in extensive, long-term narcotics enterprises involving substantial income to store contraband, proceeds of drug sales and records of drug transactions in a residence directly related to them, among other places;

 f. That drug traffickers in a large-scale drug trafficking operation must communicate often and often at a moment's notice. To do this, they typically utilize communications devices, such as beepers, pagers, cell phones, e-mail and answering machines; and they typically keep documents linking the members to such communications devices in their residences, such as bills, instructions, packaging and invoices;

 g. That persons involved in large scale drug trafficking often conceal in their residences large amounts of currency, financial instruments, precious metals, jewelry and other items of value and/or proceeds of drug transactions; and evidence of financial transactions relating to obtaining, transferring, secreting or spending of large sums of money made from engaging in narcotics trafficking activities;

 h. That when drug traffickers amass large proceeds from the sale of drugs, often the drug traffickers attempt to legitimize

these profits; and to accomplish these goals, drug traffickers utilize means including, but not limited to, foreign and domestic banks and their attendant services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations and business fronts; and writings evidencing such uses are commonly within the traffickers residence;

    i.    That cocaine is not commonly manufactured within the United States, and the State of Missouri is not a major wholesale distribution point for narcotics within the United States. It is common for narcotics traffickers to travel to major distribution centers, such as major or border cities in the State of Texas and the country of Mexico, to purchase narcotics and/or to arrange for their distribution elsewhere in the United States. After purchasing the narcotics, these narcotics traffickers will transport, or cause to be transported, narcotics to the areas in which they will distribute the narcotics. The methods of transportation they use include, but are not limited to, commercial airlines, private airlines, rental automobiles, private automobiles, and government and contract mail carriers and documents evidencing such travel are commonly within the traffickers residence;

    j.    That drug traffickers commonly maintain on their persons and in their residences addresses or telephone numbers in

books or papers which reflect names, addresses, and/or telephone numbers for their associates in the trafficking organization;

  k. That drug traffickers commonly take or cause to be taken photographs of them, their associates, their property and assets, their product, and that these traffickers usually maintain these photographs in their possession and in their residences or residences associated with their criminal acts;

  l. That narcotics traffickers usually keep near at hand paraphernalia for packaging, cutting, weighing and distributing narcotics. These paraphernalia include, but are not limited to, scales, plastic bags and cutting agents;

  m. That narcotics traffickers usually keep firearms nearby in order to protect their narcotics and/or drug proceeds.

 46. In view of the ongoing nature of the investigation and the risk of harm (to informants, to law enforcement officers and to the ongoing investigation) which would exist should the information in this affidavit be prematurely disclosed, I respectfully request that this affidavit and associated records concerning these search warrants be sealed until further order of the court.

## "List"

1. Cocaine;

2. Paraphernalia for packaging, cutting, weighing and distributing controlled substances, including, but not limited to, scales, baggies and spoons;

3. Books, records, receipts, notes, ledgers, computer hard-drives and disk records, and other papers relating to the transportation, ordering, purchasing and distribution of controlled substances and/or firearms;

4. Telephone bills, invoices, packaging, cellular batteries and/or charging devices, cancelled checks or receipts for telephone purchase/service; cellular and/or landline telephones; digital and/or alphanumeric text (two-way) pagers; computers capable of e-mail and/or chat-room communication, answering machines; address and/or telephone books and papers reflecting names, addresses, and/or telephone numbers of sources of supply, of customers, and/or evidencing association with persons known to traffic in controlled substances or to facilitate such trafficking;.

5. Photographs, in particular photographs of co-conspirators, of assets, and/or of controlled substances;

6. United States Currency, precious metals, jewelry, and financial instruments, including, but not limited to, stocks and bonds, papers, titles, deeds and other documents reflecting ownership of vehicles and property utilized in the distribution of cocaine or which are proceeds from the distribution of cocaine;

7. Books, records, receipts, pay stubs, employment records, bank statements and records, money drafts, letters of credit, money order and cashier's checks receipts, passbooks, bank checks and other items evidencing the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money;

8. Papers, tickets, notes, schedules, receipts and other items relating to travel, including, but not limited to, travel to and from St. Louis, Missouri and elsewhere;

9. Indicia of occupancy, residency, rental and/or ownership of the vehicles and/or premises described above, including, but not limited to, utility and telephone bills, cancelled envelopes, rental or lease agreements and keys; and

10. Firearms and/or weapons.